UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                :

           - v. -                          :

XAVIER CORREA, et al.,                    :

          Defendants.    :    S1 11 Cr. 59 (LAK)

- - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Parvin Moyne
Todd Blanche
Michael Ferrara
Assistant United States Attorneys
    -Of Counsel-

**PRELIMINARY STATEMENT**

The United States of America respectfully submits this memorandum of law in opposition to the pretrial motions of defendants Riccardo Buckeridge, Raymond Concepcion, Steven Lewis, David Marte, Gregory Mella, Rikelby Mella, and Joshua Rodriguez.[1]

In their motions, defendants Raymond Concepcion, Steven Lewis, Gregory Mella, Rikelby Mella, and Joshua Rodriguez, move this Court to sever certain counts of the Indictment. Defendants Lewis and Gregory Mella further move this Court for Bills of Particulars, and Lewis and Rikelby Mella move this Court to order the disclosure of certain information. Defendants Buckeridge and Gregory Mella join the motions of their co-defendants to the extent applicable. Lastly, defendant David Marte moves this Court to suppress evidence obtained pursuant to a search incident to his arrest and from the execution of a search warrant for his cellphone. A hearing for these motions, if necessary, is scheduled for May 13, 2011 at 10:30 a.m.

As discussed further below, with the exception of David Marte's suppression motion regarding evidence obtained from a search incident to his arrest, the Government respectfully submits that the Court should dismiss (without a hearing) all of

---

[1] The Government will respond to the pretrial motions recently filed by Delmour Brown, Miguel Colon, and Junior Rosario separately.

defendants' motions.  With respect to the 404(b) notice, request for any <u>Brady</u> materials, and request for 3500/<u>Giglio</u> material, the Government will make such disclosures as required by the law.

## BACKGROUND

**A.   Offense Conduct**

On or about February 1, 2011, a Grand Jury sitting in the Southern District of New York returned Indictment S1 11 Cr. 59 (LAK) (the "Indictment"), charging 30 defendants (collectively, the "Defendants") in four counts.  Specifically, Count One of the Indictment charges 22 of the Defendants with conspiring to distribute, and possess with intent to distribute, 50 grams or more of mixtures and substances containing a detectable amount of "crack" cocaine, from in or about 2005, up to and including December 2008.  Count Two of the Indictment charges 14 of the Defendants (many of whom are also charged in Count One) with conspiring to distribute, and possess with intent to distribute, 280 grams or more of mixtures and substances containing a detectable amount of "crack" cocaine, from in or about December 2008, up to and including in or about January 2011.  Count Three of the Indictment similarly charges 10 of the Defendants (many of whom are also charged in Count One, and one of whom (Jason Mojica) is also charged in Count Two) with conspiring to distribute, and possess with intent to distribute, 280 grams or more of mixtures and substances containing a

detectable amount of "crack" cocaine, from in or about December 2008, up to and including in or about January 2011.  Count Four of the Indictment charges six of the Defendants with possessing, using, carrying, and discharging firearms during and in relation to the drug trafficking crimes charged in Counts One through Three.

As of today, 23 of the Defendants have been arrested and arraigned in the Southern District of New York.  As described at the arraignments of the Defendants, and in affidavits accompanying search warrant applications, the Government's case stems from a long-term investigation by members of the New York City Police Department's Bronx Narcotics Unit into the area of Wheeler Avenue, Elder Avenue, and Westchester Avenue, in the Bronx, New York.  The bulk of the Government's evidence involves witness testimony, including the testimony of several witnesses who are cooperating with the United States Attorney's Office for the Southern District of New York.  Additionally, the Government has obtained police records indicating that, between in or about 2005 and in or about January 2011, there have been several arrests of certain of the Defendants in the Wheeler Avenue area for the illegal sale of "crack" cocaine, as well as numerous reports of shootings in the area.  Through the interviews and review of police records, the Government learned the following:

1.  From approximately in and about 2005 through in

and about 2008, a drug organization operating on Wheeler Avenue near Westchester Avenue in the Bronx sold crack and marijuana. Members of the Group called themselves "The Wheeler Boys."  The 22 individuals charged in Count One of the Indictment, among others, were members of The Wheeler Boys, which was led by defendant Xavier Correa, among others.  The Wheeler Boys sold crack on a daily basis, and, in total, sold multiple kilograms of crack.  Members of The Wheeler Boys possessed firearms on a daily basis in furtherance of their drug trafficking, and carried, used, and discharged the firearms on various occasions as part of the drug trafficking operations.

      2.   In or about December 2008, members of The Wheeler Boys had a dispute and splintered into two separate drug organizations.  One of the groups was headed by Xavier Correa and others, and sold crack and marijuana on the 1100 block of Wheeler Avenue (the "1100 Block Organization").  The 14 defendants charged in Count Two of the Indictment, among others, were members of the 1100 Block Organization.  The 1100 Block Organization sold multiple grams of crack in $10 "dime" bags seven days a week, from at least 2008 until January 2011.  Xavier Correa and other members of the 1100 Block Organization were also involved in violent disputes with other drug dealers in and around Wheeler Avenue.  Members of the 1100 Block Organization possessed firearms on a daily basis in furtherance of their drug

trafficking, and carried, used, and discharged the firearms on various occasions as part of the drug trafficking operations.

3.   The other group that splintered off from The Wheeler Boys in December 2008 was headed by Saikou Diallo, among others, and sold crack and marijuana on the 1200 block of Wheeler Avenue (the "1200 Block Organization").  The 10 defendants charged in Count Three of the Indictment, among others, were members of the 1200 Block Organization.  As with the 1100 Block Organization, the 1200 Block Organization sold multiple grams of crack in $10 "dime" bags seven days a week, from at least 2008 until January 2011.  Diallo and other members of the 1200 Block Organization were also involved in violent disputes with other drug dealers in and around Wheeler Avenue.  Members of the 1200 Block Organization possessed firearms on a daily basis in furtherance of their drug trafficking, and carried, used, and discharged the firearms on various occasions as part of the drug trafficking operations.

B.   **Post-Indictment Discovery**

On or about March 2, 2011, the Government produced its initial round of discovery to the defendants who had been arrested at that time.  Since that time, several further productions of evidence have been made to some of the Defendants. Included in the discovery was, among other things, police records related to prior arrests of certain of the Defendants on or near

Wheeler Avenue for selling crack cocaine or marijuana, reports describing any post-arrest statements, vouchers describing any items seized from the Defendants or pursuant to the search warrants, police records related to various reports of shootings, a January 2011 murder, and other crimes of violence on or near Wheeler Avenue, and phone records.

**ARGUMENT**

**I.    THE MOTION FOR IMPROPER JOINDER SHOULD BE DENIED AS MERITLESS; THE MOTIONS TO SEVER SHOULD BE DENIED AS PREMATURE.**

Several defendants make one or both of two related arguments:  (1) that the charges against them were improperly joined with charges against their co-defendants, and (2) even if not improperly joined, the charges should be severed.  As discussed, the first argument is meritless.  All of the Defendants are charged with conspiring to distribute crack on and around Wheeler Avenue.  As set forth above, the charges in the Indictment are based on a very straightforward story:  Many of the Defendants began selling crack on Wheeler Avenue in 2005, calling themselves "The Wheeler Boys."  After a leadership dispute in December 2008 turned violent, the gang split in two, with each selling crack on a different block of Wheeler Avenue. The two resulting gangs fought for customers and to protect their turf, and that violence included multiple shootings, at least one of which resulted in murder.

6

Moreover, the severance arguments are premature.  The Government does not propose to try all 30 Defendants together.  However, the parties are approximately two months from trial and the Government - which has been actively negotiating dispositions with several of the defendants - expects a number of guilty pleas in the near future.  Therefore, any ruling by the Court on the severance issue would likely need to be revisited as the trial landscape changes over the coming weeks.

### A.   **The Charges in the Indictment Were Properly Joined**

Joinder of offenses against multiple defendants in a single indictment is proper if the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count."  Fed. R. Crim. P. 8(b).

The Second Circuit has "interpreted the 'same series of acts or transactions' language of Rule 8(b) to mean that 'joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme.'"  United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008) (quoting United States v. Cervone, 907 F.2d 332, 341 (2d Cir.1990) (quotation marks omitted)).  In that context, the Second Circuit applies a "common sense rule to

decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." Id. (quotation marks omitted).

In Rittweger, two defendants argued - like some of the defendants here - "that as members of two distinct conspiracies, they should not have been joined as defendants in the same trial because the conspiracies were not and could not have been charged as a single conspiracy."  Id.  The Second Circuit rejected that argument, however, holding that "[t]he language of Rule 8(b) ... does not require such a rigid application."  Id. (citing United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003) (upholding joinder of co-defendants although neither party was charged in the conspiracy counts of the other); United States v. Marzano, 160 F.3d 399 (7th Cir. 1998) (affirming the Rule 8(b) joinder of members of two separate conspiracies and clarifying that although the "simplest case for joinder is where the defendants are charged with having conspired with each other," different conspiracies involving different defendants may be joined when they are part of the same "series of [illegal] acts or transactions")).

Therefore, courts should determine whether the joinder of defendants in two or more conspiracies is warranted "on a

case-by-case basis." Id. at 178.  Provided that the defendants

are "alleged to have participated in the same act or transaction,

or in the same series of acts or transactions, constituting an

offense or offenses," Fed. R. Crim. P. 8(b), members of two or

more conspiracies may be joined as defendants even where the

members have not been charged as participating in one overarching

conspiracy.  Id. (citing United States v. Attanasio, 870 F.2d

809, 815 (2d Cir.1989) (upholding joinder of defendants involved

in separate conspiracies on the grounds that the conspiracies

shared a common purpose and there was "an overlap of participants

and acts").

        Here, all of the charges arise and stem from The

Wheelers Boys' conspiracy to distribute crack on and around

Wheeler Avenue beginning in or about 2005, as charged in Count

One of the Indictment.  Counts Two and Three charge conspiracies

arising from the Count One conspiracy.  That is, after a violent

battle for leadership of The Wheeler Boys and its crack spot in

December 2008, the gang split into two, with one gang selling

crack on the 1100 block of Wheeler Avenue, and the other selling

crack on the 1200 block of Wheeler Avenue.  Many of the

participants were the same, including defendants (1) Xavier

Correa (charged in Counts One, Two, and Four), (2) Luis Correa

(One, Two, and Four), (3) Saikou Diallo (One, Three, and Four),

(4) Felix Rodriguez (One and Three), (5) David Marte (One and

Two), (6) Gregory Mella (One, Two, and Four), (7) Anthony Dixon (One and Two), (8) Enrique Rivera (One and Two), (9) Jason Marin (One and Two), (10) Rikelby Mella (One and Two), (11) Robert Espinal (One and Two), (12) Hector Melendez (One, Three, and Four), (13) Donnell Sanders (One and Three), (14) Miguel Colon (One and Three), (15) Omar Delvillar (One and Three), and (16) Jason Mojica (Two and Three).[2]

That the majority of defendants charged in the Indictment appear in multiple counts underscores the propriety of joinder here.  Moreover, all three of the charged conspiracies shared a common plan:  to sell crack on Wheeler Avenue to the exclusion of other dealers.  In addition, the conspiracies charged in Counts Two and Three occurred at the same time.  In finding joinder proper in United States v. Feyrer, the Second Circuit emphasized that "the schemes were run at the same time" and that the members of the two separate schemes "were aware of each other's participation in fraud."  333 F.3d 110, 114 (2d Cir. 2003).  Here, the Count Two conspirators were not only aware of the Count Three conspirators efforts to sell crack (and vice versa), they tried to kill each other to protect their turf.  The gun violence is charged in Count Four of the Indictment and further militates for joinder.

---

[2]Indeed, one of the Defendants (Jason Mojica), among others, sold for both the 1100 Block Organization and the 1200 Block Organization.

In sum, if the Court tried Counts Two and Three separately, "the evidence at one trial would essentially duplicate the evidence at the other." Id.  For example, though the cooperating witnesses who will testify at trial typically aligned themselves either with the 1100 Block Organization or 1200 Block Organization, they will still testify as to actions taken by the rival gang, many of which prompted retaliatory actions.  Indeed, the gun charge in Count Four cannot be explained without testimony concerning both rival gangs, their history (rooted in Count One), and the fight for customers and turf.

For all of these reasons, using a "common sense approach ... a reasonable person would easily recognize the common factual elements that permit joinder." Id. (quotation marks omitted).  Joinder is therefore proper under Rule 8(b) and the Court should deny the defendants' motions on that ground.

**B.** **The Severance Motions Are Premature**

Several of the defendants move for severance under Federal Rule of Criminal Procedure 14(a).  That Rule provides in part: "If the joinder of offenses or defendants in an indictment ... appears to prejudice a defendant ..., the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).  As is apparent from the defendants' speculation as to

what might occur at trial and what evidence the Government might seek to introduce, it is simply too early to know what the trial in this matter will look like.  The Government has made plea offers to almost every defendant and expects a number of guilty pleas in the near future.  Accordingly, any analysis of prejudice to an individual defendant, whether based simply on the sheer volume of the evidence, the number of defendants, or on the type of evidence that may be introduced against co-defendants, is premature.  Accordingly, the Government respectfully submits that the severance motions be denied without prejudice to renew them at a time closer to the trial date.[3]

## II.  THE MOTIONS FOR A BILL OF PARTICULARS SHOULD BE DENIED

Defendants Steven Lewis and Gregory Mella seek a bill of particulars.  Specifically, Lewis requests a bill of particulars setting forth all other persons alleged to be involved in the sales of cocaine described in subparagraph (l) of Count Two of the Indictment, the location of such sales, and the dates and times of such sales.  Lewis further requests the name of the police officer who arrested and questioned him on June 1, 2010.  Gregory Mella requests a bill of particulars as to Count

---

[3]Notably, when setting the motions schedule, the Court suggested that severance motions would be premature at this time. A number of defense counsel who did not file pretrial motions have explained to the Government that they may seek to file severance motions at a date closer to the trial date should the parties be unable to agree on a plan for trying the remaining defendants.

Four of the Indictment, which charges him and others with possessing, using, carrying, and discharging firearms during and in furtherance of the drug trafficking crimes charged in Counts One through Three of the Indictment.  Defendants Lewis' and Mella's requests should be denied.

It is well established that the proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense.  Fed. R. Crim. P. 7(f); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987).  "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  Torres, 901 F.2d at 234 (internal quotation marks omitted).

If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," such as discovery or a criminal Complaint, no bill of particulars is required.  Bortnovsky, 820 F.2d at 574; United States v. Morales, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003).  In other words, the defense cannot use a bill of particulars as a general investigative tool, United States v. Salazar, 485 F.2d 1272, 1277-78 (2d Cir. 1973), or as a device to compel disclosure of

the Government's evidence prior to trial.  See Triana-Mateus, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing United States v. Gottlieb, 493 F.2d 987, 994 (2d Cir. 1974)).  "The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed, [therefore] 'the Government is not required to provide information that would, in effect, give the defendant a preview of the Government's case before trial.'"  Id. at *5 (quoting United States v. Conley, No. 00 Cr. 0816 (DAB), 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002)).

        Under the relevant legal standard, the Government is not required to (a) "particularize all of its evidence," United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, see Torres, 901 F.3d at 233-34 (demands for "whens" and "wheres" and "by whoms" within charged conspiracy are improper attempts at general pretrial discovery); or (c) provide the defendant with a preview of the Government's case or legal theory.  United States v. Muyet, 945 F. Supp. 586, 598-599 (S.D.N.Y. 1996).  The ultimate test is whether the information sought is necessary, not whether it is helpful.  See United States v. Trippe, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); Conley, 2002 WL 252766, at *4.

14

In this case, there is no danger that defendants Steven Lewis and Gregory Mella will suffer from unfair surprise at trial.  They have received ample information about the crimes charged in the Indictment.  First, as stated in the Indictment, in affidavits for search warrants that were provided to all of the Defendants, and at the arraignments, the Government has explained the timeframe of the conspiracies and the location of the conspiracies.  The Government has further explained that the drug conspiracies operated practically around the clock for years, and that firearms were almost constantly possessed, carried, used or discharged by members of the conspiracy, making any further breakdown by time and date impossible.

Despite the detailed allegations and the extensive discovery provided by the Government, defendants Lewis and Mella seek further information.  Their requests for a bill of particulars are transparent attempts to obtain additional, detailed discovery about the charged crime, and they are not entitled to such information.  See Torres, 901 F.3d at 233-34; United States v. Sindone, 2002 U.S. Dist. LEXIS 388, at *3 ("The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present.  Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the

government's proof is not presented."); United States v. Bin Laden, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have 'almost uniformly been denied.'" (quoting United States v. Wilson, 565 F. Supp. at 1438)); United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987) ("Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial.").

Taken together, the materials already provided give all the Defendants ample opportunity to prepare their defenses and leave no possibility of unfair surprise. Accordingly, the requests to obtain unauthorized discovery through a bill of particulars should be denied.

## III. THE OTHER DISCOVERY REQUESTS SHOULD SIMILARLY BE DENIED OR DISMISSED AS MOOT OR PREMATURE.

Defendants Steven Lewis and Rikelby Mella have made motions setting forth multiple requests for additional discovery. At the outset, the Government notes that it has, as described above, already produced discovery to each of the arrested Defendants pursuant to Federal Rule of Criminal Procedure 16.[4] As

---

[4] Of course, the Government recognizes that its obligation to provide discovery is of a continuing nature, and the Government will, if it obtains additional evidence, supplement its production of material required by Rule 16(a)(1)(A) and any other provision of Rule 16, for that matter.

set forth below, because the additional discovery requests are either moot, premature, or not required by statute or the Federal Rules of Criminal Procedure, the Government respectfully submits that these requests be denied.

**A.    Prior Inconsistent Statements, Inculpatory Material, & Evidence Inconsistent with the Government's Theory.**

Defendant Lewis requests that the Government disclose (1) "any contradictory or inconsistent statements made to any law enforcement personnel/prosecutors by any individuals, regardless of whether the Government intends to call those individuals in its direct case;" (2) "any evidence that would tend to inculpate someone other than Steven Lewis in the one count in the indictment;" (3) any evidence which is inconsistent with the theory of the government's case, as set forth in its indictment, as it pertains to the role or activity of Steven Lewis;" and (4) "evidence pertaining to the credibility of informants and cooperating witnesses."

### 1.    *Brady* material

Pursuant to the Due Process Clause of the United States Constitution, the Government has a duty to disclose favorable evidence to the accused where such evidence is "material" either to the accused's guilt or punishment.  See Brady, 373 U.S. at 87. Favorable evidence includes evidence that tends to exculpate the accused, see id., as well as evidence that is useful to impeach the credibility of a government witness.  See Giglio v. United

17

States, 405 U.S. 150, 153-54 (1972).  As the Court of Appeals has explained, Brady and Giglio material must be provided by the Government "in time for its effective use at trial."  In re United States (United States v. Coppa), 267 F.3d 132, 146 (2d Cir. 2001); see also id. at 142 ("the prosecutor must disclose . . . exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made").

To date, the Government is unaware of anything that is arguably Brady material.  The Government is mindful of its continuing obligation to disclose Brady material, and will produce any such material as soon as the Government learns of its existence.

## 2. *Giglio* **and Jencks Act materials for Government witnesses**

With respect to the Giglio and Jencks Act materials requested by defendant for Government witnesses (such as prior inconsistent statements of witnesses), there is no basis for such early disclosure.  As a threshold matter, the Government has not yet identified which witnesses it intends to call at trial.  That determination will depend upon a number of considerations, including which defendants proceed to trial.  In any event, the law is clear that the Government is under no obligation under the Jencks Act, 18 U.S.C. § 3500 et seq., to produce prior statements

18

of its witnesses until after each has testified on direct examination.  The Jencks Act provides in pertinent part:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subp[o]ena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500.

Courts in this Circuit have consistently held that the district court lacks the power to mandate early production of Jencks material.  See, e.g., United States ex rel. Lucas v. Regan, 503 F.2d 1, 3 n.1 (2d Cir. 1974); In re United States, 834 F.2d 283, 287 (2d Cir. 1987); United States v. Ortiz-Montoya, No. 93 Cr. 0050 (RWS), 1995 WL 37841, at *1 (S.D.N.Y. Jan. 31, 1995); United States v. McGuinness, 764 F. Supp. 888, 896 (S.D.N.Y. 1991).

Similarly, courts in this Circuit have repeatedly refused to compel disclosure of impeachment or Giglio material (which encompasses much of the defendant's requests) well in advance of trial.  In United States v. Coppa, the Second Circuit held that the Government is not required to produce Giglio material until it produces "3500 material" pursuant to the Jencks Act, so long as the Government provides the Giglio material in time for its effective use at trial.  267 F.3d at

19

145-46; see also United States v. Nixon, 418 U.S. 683, 701
(1974) ("Generally, the need for evidence to impeach witnesses
is insufficient to require its production in advance of
trial."); United States v. Greyling, 00 Cr. 631 (RCC), 2002 WL
424655, at *2 (S.D.N.Y. Mar. 18, 2002) (production of Giglio
material by the Wednesday before the week in which a witness
will testify is appropriate); Gallo, 1999 WL 9848, at *8
(denying defendants' motions to require the early production of
Giglio and 3500 material based on Government's representations
that it would provide the information sufficiently in advance of
each witness's testimony to allow adequate time to prepare for
cross-examination); United States v. Mejia, No. 98 Cr. 4, 1998
WL 456257, at *1 (S.D.N.Y. Aug. 5, 1998) (denying defendant's
motion to compel all impeachment material under Giglio based on
the Government's representations that it would make such
information available at the time that it provides 3500
material).

        However, in order to avoid any adjournment or delay in
the trial which might conceivably occur if 3500 and Giglio
material were not produced until after the Government's
witnesses have testified, the Government will adhere to its
customary practice of producing impeachment material at the same
time as Jencks Act material, i.e. the day before the
corresponding witness will testify, or, if additional time is

reasonably required to review such material, sufficiently in advance of the witness's testimony so as to avoid any delay at trial.  This practice will allow defense counsel adequate time to prepare for cross-examination of Government witnesses as they come up at trial.

### 3. *Giglio* and *Jencks Act* materials for non-Government witnesses

The Government respectfully submits that defendant Lewis' request for Giglio and Jencks Act materials for individuals the Government does not intend to call as witnesses and whose credibility is not being relied upon by the Government be denied.  As explained further above, the Jencks Act requires that, after a witness called by the Government has testified on direct examination, the Government, upon motion by defendant, must produce to defendant any statement of such witness in its possession "which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b).  The Government is not required, however, to provide to a defendant any such information if the applicable witness does not testify at trial. See Jimenez-Garcia v. United States, 1998 U.S. Dist. LEXIS 3510, No. 97 Civ. 2911, 1998 WL 132788, at *3 (S.D.N.Y. Mar. 24, 1998) (holding that material for witnesses need not be produced to defendant where the witnesses "were not called as government witnesses at trial").

### B.   **Rule 404(b) Material**

Defendant Lewis requests that the Court order the Government to provide its disclosure of 404(b) evidence.  The Government consents to this request and will make its disclosure of 404(b) evidence with respect to all Defendants within at least two weeks of the scheduled trial date, if not earlier.

### C.   **Information Regarding the Government's Compliance with Its Petite Policy**

Defendant Rikelby Mella moves the Court to order the Government to provide information regarding the Government's compliance with its internal policies regarding dual and successive prosecutions (the "Petite Policy").  Specifically, Mella wants information regarding whether the Government sought and received the appropriate permission to proceed with its case against him, charging him in two drug conspiracies (Counts One and Two), notwithstanding his conviction in New York State court for a drug transaction that was listed as an overt act in Count One of the Indictment.

Notably, Mella does not contend – nor could he – that the instant prosecution violates the Double Jeopardy Clause, or any constitutional or statutory right.  Instead, he relies on a provision of the United States Attorney's Manual ("USAM") detailing the Department of Justice's policy regarding "the exercise of discretion by appropriate officers of the Department of Justice in determining whether to bring a federal prosecution

based on substantially the same act(s) or transactions involved in a prior state or federal proceeding." See USAM 9-2.031.

Mella's reliance on the USAM is misplaced.  Second Circuit case law and the Manual itself make plain that its provisions confer no rights whatsoever.  See USAM 1-1.000 ("The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal"); United States v. Catino, 735 F.2d 718, 725 (2d Cir.1984) (provisions of USAM create no enforceable rights); United States v. Ng, 699 F.2d 63, 71 (2d Cir.1983) (same).  Accordingly, Mella's request for information concerning the Government's compliance with its internal policies should be summarily denied.

## IV.  EVIDENCE OBTAINED FROM DAVID MARTE'S CELLPHONE PURSUANT TO A SEARCH WARRANT SHOULD NOT BE SUPPRESSED

Defendant David Marte challenges the issuance and execution of a search warrant to search his cellphone.[5] Specifically, Marte argues that there was no probable cause for the issuance of a search warrant to search his cellphone, which had been seized incident to his arrest.  Marte further argues that the search warrant affidavit was so lacking in indicia of probable cause as to render any reliance on the warrant

---

[5]Marte does not challenge the seizure of the cellphone, which occurred incident to his arrest.

"unreasonable."   Because the search warrant for Marte's cellphone was issued after a review by a magistrate judge, because the affidavit in support of the search warrant sets forth probable cause to believe that evidence of criminal activity would be found in the cellphone, and because law enforcement's reliance on the search warrant was done in good-faith, Marte's challenge to the warrant should be denied and his motion to suppress evidence obtained pursuant to the execution of the search warrant should be denied.

### A.   **Relevant Facts**

On February 2, 2011, the defendant was arrested at his residence in the basement apartment of 523 Tinton Avenue, Bronx, New York.   Incident to the arrest, the police seized, among other things (some of which are described below), Marte's cellphone.[6]   On February 17, 2011, a magistrate judge issued a search warrant for the search of Marte's cellphone.[7]   (A copy of

---

[6]Defense counsel's memorandum of law describes the cellphone as the defendant's, although the defendant's accompanying affidavit simply states that "a" cellphone was seized, among other objects, from his apartment.   The Government assumes that Marte acknowledges ownership of the cellphone for purposes of his suppression motion.

[7]On February 10, 2011, a magistrate judge issued a search warrant for the search of what was then believed to be David Marte's cellphone. On February 17, 2011, a magistrate judge issued a search warrant for the search of the cellphone that had actually been in Marte's possession at the time of his arrest. In the accompanying affidavit to the February 17, 2011 search warrant application, the affiant (a detective with the New York Police Department) explained that the February 10, 2011, had mistakenly sought to search a cellphone that had actually been

the affidavit submitted in support of the Government's
application for that search warrant is attached hereto as
Exhibit A.)  The search warrant affidavit requests authorization
to search Marte's cellphone for evidence of illegal narcotics
trafficking.

In support of the Government's request for a search
warrant for Marte's cellphone, the testifying agent set forth
facts showing that Marte participated in the crack distribution
conspiracies charged in Counts One (the Wheeler Boys) and Two
(the 1100 Block Organization) of the Indictment (Ex. A at ¶ 8);
that members of The Wheeler Boys and of the 1100 Block
Organization used cellphones to communicate among themselves and
with potential customers to facilitate drug transactions (Ex. A
at ¶ 10); and that Marte continued to deal crack cocaine at the
time of his arrest (Ex. A at ¶ 9 (explaining that 60 grams of
crack, packaged for sale, was seized from Marte at the time of
his arrest)).  The testifying agent further explained that, in
addition to the specific information that Marte's drug
organizations used cellphones, the agent learned from his
approximately 17 years in law enforcement that drug dealers'
cellphones often contain information regarding past and present
co-conspirators and customers, among other evidence (Ex. A at ¶
11).

---

seized from a different defendant (Donnell Sanders).

B.    **Applicable Law**

When considering whether to grant an application for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates*,* 462 U.S. 213, 238 (1983).  Similarly, a showing of a sufficient nexus between the alleged criminal activities and the premises or object to be searched "does not require direct evidence and 'may be based on 'reasonable inference' from the facts presented based on common sense and experience.'"  United States *v.* Singh, 390 F.3d 168, 182 (2d Cir. 2004) (internal citations omitted).  Probable cause determinations must be approached in a practical way, Gates*,* 462 U.S. at 232, because "probable cause is a flexible, common-sense standard."  Texas *v.* Brown, 460 U.S. 730, 742 (1983).  In sum, the evidence presented to the Magistrate Judge "'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'"  Gates, 462 U.S. at 231-32 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)); see also United States *v.* Shipp, 578 F. Supp. 980, 985 (S.D.N.Y. 1984) ("The standard in reviewing a previous determination of probable cause for the issuance of a search warrant by a judicial officer is 'only a probability and

not a prima facie showing of criminal activity.'" (quoting United States v. Travisano, 724 F.2d 341, 345-46 (2d Cir. 1983)).

The duty of a court reviewing a magistrate judge's probable cause determination is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Gates, 462 U.S. at 214. The information considered by the magistrate judge should take into account the "totality of the circumstances" and entail an "assessment of probabilities in particular factual contexts." Id. at 232-33.

Once a "neutral and detached magistrate" issues a search warrant upon a finding of probable cause, that finding is "entitled to substantial deference, and 'doubts should be resolved in favor of upholding the warrant.'" United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993) (quoting Travisano, 724 F.2d at 345)). Indeed, the magistrate's "finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." Travisano, 724 F.2d at 345.

Even in instances where evidence is seized pursuant to a warrant for which probable cause was lacking, the evidence nevertheless is admissible upon a showing that the officers who executed the warrant did so in "objective good faith." United States v. Leon, 468 U.S. 897, 923 (1984). The test for

27

ascertaining whether the agents acted in good faith requires assessment of "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 923 n.23.  The good faith exception is only inapplicable in situations: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable. Leon, 468 U.S. at 923; see also United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992) (citing Leon).  By contrast, if the reviewing court finds that the officers' reliance on the warrant was objectively reasonable, suppression is not warranted. See, e.g., United States v. Roberts, 852 F.2d 671, 675 (2d Cir. 1988).

### C.  **Discussion**

Under these legal standards, Marte's challenge to the search warrant is wholly without merit.  First, as set forth in the search warrant affidavit, the testifying agent set forth his opinion, based upon his experience in numerous drug trafficking investigations, that drug traffickers often used their cellphones to communicate with co-conspirators and customers. As the Second Circuit has recognized, a Government agent's

28

expert opinion "is an important factor to be considered by the
judge when making a probable cause determination[,]" United
States *v.* Benevento, 836 F.2d 60, 71 (2d Cir. 1987) (internal
quotation marks omitted) and expert opinion, standing alone, may
be sufficient to issue a warrant.  Id. at 70.  This Court is
entitled to rely on the agent's opinion, as well as the
commonsense notion that an individual engaged in a conspiracy
may have evidence of that conspiracy, including telephone
numbers and other contact information, located in communication
devices used by the individual.  See also United States v. Fama,
758 F.2d 834, 838 (2d Cir. 1985) (approving of district courts'
reliance on agent's expert opinion that narcotics traffickers
"frequently maintain at their homes large amounts of cash,
drugs, books, ledgers and other documents evidencing their
criminal activities"); see also United States v. Brown, 676 F.
Supp. 2d 220, 228 (S.D.N.Y. 2009) (McMahon, J.) (holding that
magistrate judge could rely solely on expert opinion in
determining whether there was probable cause to search a drug
dealer's cellphone); United States v. Mullen, 451 F. Supp. 2d
509, 543-44 (W.D.N.Y. 2006) (holding that magistrate judge could
rely on expert opinion that drug dealer's residence, vehicle,
and place of business contained evidence of criminal activity).
Moreover, in this case, the testifying agent further explained
that cooperating witnesses and phone records demonstrated what

29

his years of experience had taught him – that members of conspiracies charged in this case used their cellphones to communicate with co-conspirators and customers.  So the search warrant affidavit did not simply rely on what drug dealers do generally, but also provided information about these specific drug dealers.[8]

In any event, even if the warrant were somehow deemed invalid, the evidence that was obtained from Marte's cellphone should not be suppressed on the basis of the  "objective good faith" of the officers obtaining the warrants and engaging in the search.  Leon, 468 U.S. at 923.  Marte does not (nor could he) claim the testifying agent misled the magistrate judge. Rather, Marte simply asserts that "the search warrant affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Notably, Marte fails to cite a single case in support of this

---

[8]The testifying agent could not say conclusively whether Marte's cellphone was specifically used for drug trafficking (or specifically contained evidence of drug trafficking) because the agent had no way of knowing the number for the cellphone without a search warrant.  However, the standard is probable cause, which was established through the agent's general knowledge of drug trafficking and his specific knowledge of this case.  See United States v. Gaskin, 364 F.3d 438, 456-57 (2d Cir. 2004) (Fourth Amendment's requirement of a "fair probability" that evidence of crime exists necessary to support issuance of a warrant may be established based on experience and evaluation of facts by trained police officer).

assertion.[9]  As discussed above, courts have, in fact, upheld search warrants that (unlike the present case) rely solely on an agent's expert opinion that a location or object is likely to contain evidence of criminal activity.  See, e.g., Gaskin, 364 F.3d at 456-57; Fama, 758 F.2d at 838; Brown, 676 F. Supp. 2d at 228; Mullen, 451 F. Supp. 2d at 543-44.  Moreover, the case law on whether a search warrant is needed at all to search a cellphone seized incident to arrest is unsettled.  Several courts have upheld the search of a cellphone – without a search warrant – incident to a defendant's arrest.  See, e.g., United States v. Murphy, 552 F.3d 405, 412 (4th Cir. 2009) (data retrieval search of cellphone valid as incident to arrest because phone was on defendant's person at time of arrest); United States v. Finley, 477 F.3d 250, 259-60 (5th Cir. 2007) (search of cellphone valid as incident to arrest because phone was in defendant's pocket at time of arrest).  In light of the

---

[9]Indeed, in United States v. Gomez, 652 F. Supp. 461, 463 (E.D.N.Y. 1987), on which Marte relies, the District Court held that a warrant to search a drug dealer's home that was based solely on the testifying agent's expert opinion that drug dealers' homes often contain drug records lacked probable cause, but held that reliance on the warrant was in good faith and denied the defendant's motion to suppress.  The District Court explained that the agent's expert opinion established a nexus between the evidence sought and the place being searched such that reliance on the warrant was not unreasonable.  While the Government presently contends the Gomez's Court probable cause analysis was flawed, even if adopted, in the instant case, such reliance is even more reasonable given the specific information the testifying agent had with respect to the use of cellphones by Marte's co-conspirators.

fact that law enforcement may be permitted to search phones without a search warrant, and has been permitted to execute a search warrant based solely on expert opinion, an officer's reliance on a search warrant authorizing such a search should not be deemed unreasonable.  Accordingly, Marte's motion to suppress the evidence obtained from the search of his cellphone should be denied.

## V.   EVIDENCE OBTAINED FROM DAVID MARTE'S APARTMENT PURSUANT TO A SEARCH INCIDENT TO HIS ARREST SHOULD NOT BE SUPPRESSED.

Defendant David Marte argues that the Court should suppress evidence obtained during his arrest, including crack cocaine found in a case in his apartment and in his jacket. Marte summarily asserts that this evidence was not in plain view, and accordingly cannot have been found pursuant to a lawful search incident to arrest.  As discussed below, the Government expects the evidence to demonstrate that some of the crack cocaine at issue was in plain view and some was in a jacket that Marte asked to wear out of his residence when arrested.  Accordingly, the Government's seizure of such evidence was lawful.  For all of these reasons, the Court should hold a brief evidentiary hearing and deny Marte's motion.

### A.   Factual Background

The Government expects the testimony at a hearing would establish the following:  On February 2, 2011, officers from the New York City Police Department entered 523 Tinton

Avenue, Bronx, New York (the "Building"), to execute an arrest
warrant for Marte.  Marte's father met officers at the
Building's entrance and directed them to a room in the basement.
Officers knocked on the door to the basement room and Marte
answered.  Officers entered the basement room and arrested
Marte.  Lying in plain view on the floor of the room was a red-
and-clear plastic case, which was open.  Inside the case were
numerous small ziplock bags of crack (i.e., "dime bags") bundled
for sale, and a scale.

Immediately recognizing the contents of the case as
crack cocaine, officers seized the case and its contents.  As
officers prepared to take Marte from the room, Marte asked
officers for his jacket.  Before handing the jacket to Marte,
officers searched it to ensure that it did not contain a weapon.
Officers found more crack cocaine, similarly packaged and
bundled, in one of the jacket's pockets.

**B.     The Crack Cocaine in the Case Was in Plain View and
Marte's Jacket was Properly Searched After His Request
to Wear It.**

"To justify a warrantless seizure under the plain view
doctrine, [1] the officer must 'be lawfully located in a place
from which the object can be plainly seen,'" and (2) "the
incriminating character of the goods [must] be immediately
apparent."  Bradway v. Gonzales, 26 F.3d 313, 319-20 (2d Cir.
1994).  Here, as in Bradway, id. at 318, officers were in

Marte's room to execute a court-authorized warrant for Marte's arrest.  Officers had knocked on the door of the Building and Marte's father had told them, in substance and in part, to look for Marte in the basement.  The officers were therefore lawfully in Marte's room in the basement, when they saw the crack cocaine in plain view in an open, plastic case on the floor.  <u>E.g.</u>, <u>United States</u> v. <u>Lovelock</u>, 170 F.3d 339, 343 (2d Cir. 1999) ("[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.").  Moreover, the crack cocaine was packaged in small, individual bags and bundled for sale.  The fact that it was contraband, therefore, was immediately apparent to the officers.  <u>E.g.</u>, <u>United States</u> v. <u>Williams</u>, 272 Fed. Appx. 4, 5-6 (2d Cir. 2007) (holding that warrantless seizure of "glassine envelopes consistent with street level narcotics distribution in a transparent box," was reasonable under the Fourth Amendment").

      With respect to the crack cocaine found inside Marte's jacket, the officers properly searched the jacket and seized its contents.  As described above, when departing in police custody, Marte requested the jacket to wear outside.  Marte's motion fails to offer any meritorious argument that this search was unlawful.  Marte's person — including the items of clothing he voluntarily put on during the arrest process — was searched

incident to his lawful arrest.   See United States v. Robinson,
414 U.S. 218, 235 (1973) (search incident to lawful custodial
arrest "is not only an exception to the warrant requirement of
the 4th Amendment, but is also a 'reasonable' search under that
[a]mendment").   It is well established that

> [w]hen an arrest is made, it is reasonable
> for the arresting officer to search the
> person arrested in order to remove any
> weapons that the latter might seek to use in
> order to resist arrest or effect his escape
> . . . . In addition, it is entirely
> reasonable for the arresting officer to
> search for and seize any evidence on the
> arrestee's person in order to prevent its
> concealment or destruction.  And the area
> into which an arrestee might reach in order
> to grab a weapon or evidentiary items must,
> of course, be governed by a like rule. . . .
> There is ample justification, therefore, for
> a search of the arrestee's person and the
> area 'within his immediate control' -
> construing that phrase to mean the area from
> within which he might grain possession of a
> weapon or destructible evidence.

Chimel v. California, 395 U.S. 752 (1969), 395 U.S. at 762, 763.
Here, it was clearly reasonable for the officers to search
Marte's jacket before permitting him to wear it — and therefore
be in his immediate control — both to remove any weapons, as
well as any evidence of his criminal activity.  Indeed, by
requesting the jacket, Marte arguably consented to its search.

Furthermore, any argument that the jacket was not in
Marte's possession at the time of the search, and therefore not
incident to his arrest, is vitiated by the exigency of the

circumstances of his request for the jacket to wear outside in the cold weather.  In United States v. Gwinn, 219 F.3d 326, 333 (4th Cir. 2000), for example, the court determined that a search and reentry of a home to look for boots for a barefoot arrestee was valid because of the exigency "created by the substantial risk of injury" to the defendant if he were permitted to walk without shoes.  See also United States v. Di Stefano, 555 F.2d 1094, 1101 (2d Cir. 1977) (holding that officers have "a duty to find clothing for [an arrestee in their custody] to wear or to permit [the arrestee] to do so").  In light of the February weather, having Marte put on a jacket to wear outside was necessary and justified the jacket's search.

For these reasons, the Court should deny Marte's motion after a short evidentiary hearing.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny defendants' motions, with the exception of defendant Marte's motion to suppress evidence obtained pursuant to a search incident to his arrest.  As to that motion, the Government consents to an evidentiary hearing, at which hearing the Government submits that the evidence will demonstrate that the search was lawful and the evidence obtained admissible at trial.


Dated:     New York, New York
           April 18, 2011


                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney for the
                    Southern District of New York


                    By:  ___/s/_____
                    Parvin Moyne/Todd Blanche/Michael Ferrara
                    Assistant United States Attorneys
                    (212) 637-2510/2494/2526

## <u>AFFIRMATION OF SERVICE</u>

PARVIN MOYNE, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.  That, on April 18, 2011, I caused the Government's Memorandum of Law in Opposition to Defendants' Pretrial Motions to be delivered by ECF to all counsel of record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   New York, New York
         April 18, 2011

                                    ___/s/_____
                                    Parvin Moyne